IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-21045

_____

GILBERT "BUDDY" DIAL,

     Plaintiff/Counter Defendant/Appellee,

versus

NFL PLAYER SUPPLEMENTAL DISABILITY PLAN,

     Defendant/Counterclaimant/Third-Party Plaintiff/Appellant,

versus

JANICE MARYE,

     Third-Party Defendant/Appellant.

- - - - - - - - - -
Appeals from the United States District Court
for the Southern District of Texas
- - - - - - - - - -
May 7, 1999

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:

An ERISA-qualified employee benefits plan and a potential beneficiary challenge a district court's determination on distribution of benefits. We vacate and remand to the district court to render judgment in favor of the defendant/counter-claimant/third-party plaintiff/appellant and to consider the third-party defendant/appellant's request for attorneys' fees.

I

Gilbert "Buddy" Dial and Janice Marye married in 1959 and

divorced in 1977. From 1959 until 1968, Dial played professional football in the National Football League. As an NFL player, Dial became eligible to receive benefits from the NFL Bert Bell Retirement Benefit Plan (the "Bell Plan"), which provided both retirement and disability benefits for players. Upon their divorce, Dial and Marye entered into a property settlement agreement, which was incorporated into their divorce decree. The property set aside for Marye in the agreement included "[o]ne-half of any interest Buddy Dial has in the Bert Bell NFL Player Retirement Plan or any consideration, monetary or otherwise, that presently or hereinafter will flow to Buddy Dial from said plan." The 1977 divorce decree also awarded Marye "one-half of any later-discovered property."

Dial began receiving "total and permanent" disability benefits from the Bell Plan in March 1980. Dial apparently did not notify Marye that he was receiving such benefits, did not distribute one-half of the benefits to her, and did not reveal the existence or terms of the 1977 property settlement agreement to the Bell Plan. Marye learned in 1991 that Dial was receiving such benefits. When Dial refused to surrender half of the benefits to Marye, she filed a motion in state court to clarify the divorce decree. At that time, Marye asked the court to sign a qualified domestic relations order ("QDRO") ordering the Bell Plan to send payments directly to her. In June 1992, Dial turned 55, and his disability benefits converted to retirement benefits.

In February 1993, Marye and Dial compromised and settled the state action. Marye agreed to give up the previous years' benefits due her under the 1977 agreement and accepted a QDRO ordering the Bell Plan to send 37.5 percent of Dial's future benefits directly to her. The QDRO echoed the 1977 agreement's language: It provided that Marye would receive 37.5 percent of "the current distribution of any interest [Dial] has in the Plan as of October 7, 1977 and any consideration, monetary or otherwise, that presently or hereafter will flow to [Dial] from said Plan." Marye received her first monthly payment from the Bell Plan in March 1993 for $1,500, or 37.5 percent of Bell's $4,000 monthly benefits. Dial continued to receive $2,500 monthly, or the remaining 62.5 percent.

In July 1993, the NFL Management Council and the NFL Players Association entered into a collective bargaining agreement ("CBA") that increased player benefits and restructured existing benefits plans. The Bell Plan was merged with the Pete Rozelle NFL Player Retirement Plan to form the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Bell/Rozelle Plan"). Dial's benefit under the Bell/Rozelle Plan was $4,000, the same that it had been under the Bell Plan. The CBA also required the NFL to create the new NFL Player Supplemental Disability Plan (the "Disability Plan"). The Disability Plan provided the bargained-for benefits increase, paying additional disability benefits to certain disabled players. The Disability Plan apparently came into

existence only because, owing to IRS regulations, the NFL could not offer under the existing Bell/Rozelle Plan all the player benefits resulting from the CBA. The Disability Plan pays benefits only to players who, like Dial, were already entitled to receive benefits under the Bell/Rozelle Plan. At that time, Dial began receiving $2,250 per month from the Disability Plan, in addition to his $4,000 per month from the Bell/Rozelle Plan. Dial did not tell Marye about the new, supplemental benefits he was receiving.

In July 1994, Marye discovered that Dial was receiving supplemental benefits. She submitted the property settlement agreement from her divorce to the Disability Plan. The Disability Plan's administrators (the "Plan administrators") determined that the 1977 property settlement agreement gave Marye a one-half interest in Dial's supplemental benefits. The Plan administrators did *not* rely on the 1993 QDRO that entitled Marye to 37.5 percent of Dial's Bell Plan benefits; instead, they found that the Disability Plan benefits constituted "later discovered" property to be divided evenly between Dial and Marye under the 1977 divorce agreement. In August 1994, the Disability Plan notified Dial that it had concluded that Marye was due half of Dial's Disability Plan benefits. The Plan administrators stated that if Dial disputed the Disability Plan's conclusion before October 1994 it would not begin making the payments to Marye. When Dial

-4-

failed to respond, the plan began paying Marye $1,125 per month, or 50 percent of Dial's Disability Plan benefits at that time. (The supplemental payments increased in March 1995 to $3,085 and in March 1997 to $4,335 monthly.)

Not until February 1996 did Dial contact the Disability Plan and ask it to stop paying benefits to Marye. The Plan administrators refused, stating that the payments complied with the settlement agreement and that state court would be the appropriate forum for Dial to resolve with Marye any dispute concerning the 1977 settlement agreement. On April 25, 1996, Dial filed this action against the Disability Plan in federal district court for breach of fiduciary duty and for declaratory judgment that he is entitled to all of the Disability Plan benefits. Dial did not name Marye as a party to the action. On February 19, 1997, the district court granted the Disability Plan's motions (1) to add Marye as a third-party defendant and (2) to deposit the disputed benefits into an interest-bearing interpleader account each month. On May 1, 1997, Marye filed a state-law cross-claim against Dial, requesting the court to treat the Disability Plan benefits as community property earned during her marriage to Dial and to divide the benefits accordingly. The district court granted summary judgment to Dial on October 28, 1997. At the same time, the court denied as moot the Disability Plan's and Marye's motions for summary judgment and dismissed Marye's cross-claim without prejudice. The court also directed

-5-

Dial to file a supplemental motion for attorneys' fees from the Disability Plan, which it awarded on December 8, 1997. The Disability Plan and Marye appealed to this Court.

II

The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., governs the Disability Plan. ERISA includes anti-alienation and anti-assignment clauses that apply to former spouses' rights to pension benefits. *See* 29 U.S.C. § 1056(d)(1), (d)(3)(a). The 1984 Retirement Equity Act ("REA") amended these provisions to allow ERISA-qualified benefits to be assigned pursuant to a QDRO, which "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(I)(*i*). The REA provides procedures that a plan administrator must follow to determine if a state-court domestic relations order is "qualified." An ERISA plan administrator may treat a domestic relations order signed before the REA took effect in 1985 as a QDRO even if the order fails to meet the statutory requirements otherwise applied to QDRO's. *See* Retirement Equity Act, Pub. L. No. 98-397, § 303(d), 98 Stat. 1426, 1453 (1984). The Disability Plan treated Dial and Marye's 1977 divorce decree, which incorporated their property settlement splitting later-discovered property, as a QDRO.

-6-

The district court correctly characterized Dial's suit as an ERISA action. The Disability Plan contends that Dial should instead have brought a state-law claim against Marye for clarification of the settlement agreement. ERISA § 514(a) provides in part:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a). The propriety of Dial's federal action rests upon whether it "relates to an[] employee benefit plan" under ERISA § 514(a). Courts read § 514(a)'s "relates to" provision very broadly. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S. Ct. 2890, 2900 (1983). This Circuit stated in 1990 that cases preempting state-law claims with ERISA

> have at least two unifying characteristics: (1) the state law claims address areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claims directly affect the relationship among the traditional ERISA entities--the employer, the plan and its fiduciaries,

and the participants and beneficiaries.
*Memorial Hospital System v. Northbrook Life Insurance Co.*, 904 F.2d 236, 245 (5th Cir. 1990). In the instant case, Dial's claim concerns "traditional ERISA entities": himself (a Plan participant), Marye (a potential Plan beneficiary), the Plan, and the NFL (administrator and employer). Dial seeks benefits that, in the absence of QDRO, he is due; paying him those benefits is among the Plan administrators' ERISA-governed responsibilities. Dial's suit was proper under ERISA. *Cf., e.g.*, *Brandon v. Travelers Insurance Co.*, 18 F.3d 1321, 1325 (5th Cir. 1994) ("[T]he designation of a beneficiary 'relates to' the provision of an ERISA plan to a sufficient degree to be preempted by that statute."); *Carland v. Metropolitan Life Insurance Co.*, 935 F.2d 1114, 1121 (10th Cir. 1991) (holding that an ex-wife's state claim to recover ERISA-qualified insurance benefits pursuant to a divorce decree amounted to an ERISA § 504 claim for breach of fiduciary duty against the plan administrators); *Brown v. Connecticut General Life Insurance Co.*, 934 F.2d 1193, 1195 (11th Cir. 1991) (holding that ERISA preempted a state action for a declaration of the rightful beneficiary of an ERISA-qualified group life insurance policy pursuant to a divorce agreement); *McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir. 1990) (holding that ERISA preempts a state-law claim for designation of beneficiary).

III

The Disability Plan gives its administrators discretionary authority to interpret the Plan provisions, such that a court should review the administrators' factual determinations and plan interpretations for abuse of discretion. *See Sweatman v. Commercial Union Insurance Co.*, 39 F.3d 594, 597 (5th Cir. 1994). In this case, however, the Plan administrators neither made factual determinations nor interpreted the Disability Plan. Instead, the Plan administrators interpreted the meaning of a separate contract between Dial and Marye; they had to answer two questions: (1) whether the 1974 property settlement agreement constitutes a QDRO for Plan purposes, and (2) if so, what the distribution of benefits should be under the settlement agreement. A court reviews a plan administrator's statutory and legal conclusions de novo. *See Penn v. Howe-Baker Engineers, Inc.*, 898 F.2d 1096, 1100 (5th Cir. 1990) (reviewing de novo plan administrators' determination as to whether an employee was an independent contractor for coverage purposes). Likewise, the district court here did not owe deference to the Disability Plan administrators' interpretation of a domestic relations order, a contract judicially approved by a state court. *See Matassarin v. Lynch*, --- F.3d ---, --- (5th Cir. 1999); *see also Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 114 (3d Cir. 1994) (stating that the district court "did not err in holding

-9-

that it should review de novo the plan administrator's construction of the [divorce agreement], which invoked issues of contract interpretation under the Agreement and not the plan"). The district court erred in reviewing the Plan administrators' decision for abuse of discretion only and should instead have employed de novo review.

IV

In deciding to pay one-half of Dial's Disability Plan benefits to Marye, the Plan administrators relied on the 1977 property settlement. According to the Plan administrators, Dial's Disability Plan benefits fall within the settlement agreement's provision that "in the event the parties are mistaken and there exists any other property, separate or community, which is not listed herein which is later discovered, then the same shall be divided fifty percent (50%) to Wife and fifty percent (50%) to Husband."[1] The Plan administrators did not find that the Disability Plan benefits were governed by the separate agreement, the 1993 QDRO, which awarded Marye just 37.5 percent of benefits

---

    1.    The Plan administrators argued to the district court:
    At the time they entered into the Property Settlement
    Order in 1977, Mr. Dial and Ms. Marie [*sic*]
    mistakenly believed that all of the rights to deferred
    benefits Mr. Dial had earned during his career as an NFL
    Player from the 1959 through 1968 football seasons were
    embodied in the Bert Bell Plan. With the establishment
    of the Bert Bell/Pete Rozelle Plan and the Disability
    Plan in 1993, it became apparent that this belief was
    mistaken. Ms. Marie [*sic*] discovered the existence of
    the additional property--Mr. Dial's benefit under the
    Disability Plan--in 1994.

-10-

that "flowed to" Dial from the Bell Plan.[2]

The district court, reviewing for abuse of discretion, found that the Disability Plan's benefits interpretation was both legally incorrect and arbitrary and capricious. The court stated that, under the administrators' reading, the disability benefits need not have been in existence in 1977 in order to constitute

---

2. Curiously, however, the Plan administrators state in their brief that Article III of the 1977 divorce decree--the "flow to" provision--supports their decision to pay one-half of the Disability Plan benefits to Marye. The Plan administrators offer no explanation as to why the 1977 "flow to" provision would support their decision but the identical language in the 1993 QDRO would not apply. According to Dial, the Disability Plan's failure to apply the 1993 QDRO to the Disability Plan precludes it from relying on the 1977 settlement's "flow to" language. We agree with Dial. But the record reveals, and the district court's order granting summary judgment recognizes, that the Plan administrators neither needed to rely upon nor did rely primarily on the 1977 "flow to" provision. On August 11, 1994, the Plan wrote to Marye's counsel:

> Although . . . the property settlement agreement refers specifically only to benefits under the [Bell/Rozelle Plan], we think the language on page 3 of that document to divide 50/50 "any other property, separate or community, which is not listed herein which is later discovered" is sufficient to provide Ms. [Marye] with 50% of the benefit otherwise payable under the Supplemental Disability Plan to Mr. Dial.

The district court's opinion states:

> NFL did not grant Marie [*sic*] the lower percentage share of 37.5 percent as stipulated in the 1993 QDRO because that order explicitly stated that it related to the Bert Bell NFL Player Retirement Plan (Memorandum in Support of NFL's Motion, Instrument No. 43, Exh. 7, at 1). Thus, NFL reasoned, limiting Marie's [*sic*] award to 37.5 percent of Dial's benefits under the new disability plan based on the later 1993 QDRO would be improper.

We agree with the district court's implication that the Plan administrators based their decision on the "later discovered" property clause.

"later discovered" property. This interpretation, the district court found, conflicted with the 1977 settlement agreement's "purpose and intent" clause. That clause states:

> Husband and Wife have caused this Article to be added to and made a part of this Agreement in an effort to clarify the purposes of the parties and with a view of aiding any Court before which this Agreement should come for interpretation or enforcement. . . . The parties have attempted to divide their marital property in a manner which conforms to the "just and right" standard. . . . The parties believe that . . . [a just and right] standard is best met by an equal division and partition of the marital property in existence as of the date . . . [the settlement agreement] is executed.

Implicit in the court's conclusion that the "purpose and intent" clause conflicted with the administrators' interpretation of "later discovered property" are two assumptions: (1) that the administrators' interpretation in fact dictates that property need not have existed in 1977 in order to come within the "later discovered" clause; and (2) that because the Disability Plan did not exist in 1977, Dial's benefits paid by the Plan did not exist in 1977. We find neither assumption defensible. Dial's disability benefit was in existence by the 1977 divorce, insofar as he had already finished his NFL career, thereby earning his right to the

benefits, and had nothing left to do but wait for his benefits to vest. The disability benefit did not yet exist in 1977 only if Dial's later act of "becoming disabled" could be said to have earned or created the benefit. Dial did nothing after 1977 to earn disability benefits. Instead, a contingent disability benefit--contingent upon the development of the disabling condition from injuries already assumed while Dial played football--belonged to Dial as of the time he ended his football career. What changed in 1993 was not the fact or existence of the disability benefit, but merely the benefit's payment size and the source from which the payments came. Under this reading, the Plan administrators' decision does not require any property created after the 1977 settlement agreement to fall within the "later discovered" provision, and the district court's reason for finding legal untenableness vanishes.

Reviewing the Plan administrators' interpretation de novo, as the district court should have done, we find the interpretation legally correct. Because no material facts are disputed, we vacate the district court's decision and direct the entry of judgment for the Disability Plan.

Our decision should not be extended beyond this case's specific circumstances. Dial and Marye are now long divorced. Dial, and not Marye, must deal with the consequences, including medical bills and loss of alternate income, attributable to his football-related disability, for which the disability benefits

are intended to compensate. We recognize that problems could arise if we were to create a general rule that disability benefits are later-discovered property subject to division under a divorce agreement. Had Dial, for example, worked during his marriage in a factory and years later unexpectedly developed respiratory problems found to be attributable to the factory environment, we would not contemplate awarding one-half of any settlement therefrom to Marye on the basis of the "later discovered" clause. The result we reach in this case is mandated because Dial's contingent disability benefit existed at the time of the divorce and because Dial and Marye entered their divorce agreement after the enactment of ERISA but before the 1984 Retirement Equity Act. The REA allows the splitting of ERISA-qualified disability benefits by specific intent of the parties, i.e., by reference to the plan and to the benefits in a judicially approved QDRO. But Congress in enacting the REA also allowed pre-1984 agreements to suffice as QDROs even without the panoply of statutory protections. Such is the case here. Had Dial and Marye entered their property settlement agreement after the REA became effective, then the Plan administrators could not have treated the "later discovered" clause as a QDRO. Because they entered the agreement in 1977, and because they later discovered the Disability Plan would pay a larger benefit that constitutes "later discovered" property, the Plan administrators' decision was legally correct.

V

A district court may in its discretion award attorneys' fees to any party in an ERISA suit. *See* 29 U.S.C. § 1102(g)(1). We review for abuse of discretion the district court's decision to grant attorneys' fees to Dial. *See Todd v. AIG Life Insurance Co.*, 47 F.3d 1448, 1458 (5th Cir. 1995). We find that the district court abused its discretion.

In deciding whether to award attorneys' fees, a district court applies the five-factor test set forth in *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255 (5th Cir. 1980). The court considers:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.* at 1266; *see Todd*, 47 F.3d at 1459. The district court cited *Bowen* and offered this discussion of whether to award attorneys' fees:

-15-

In the instant case, the Court finds that an award of attorneys' fees and costs would be proper. First, although the Court stops short of accusing NFL of acting in bad faith, NFL is clearly responsible for its erroneous interpretation that was in direct conflict with the plain meaning of the settlement agreement. Second, NFL has the ability to pay an award of attorneys' fees. Third, an award of attorneys' fees in the instant case would deter other administrators from straining to justify an interpretation of a QDRO that is clearly inconsistent with other provisions in the order. With respect to the last factors [of the *Bowen* test], even though Dial's suit was limited to the vindication of his own claim under the plan and did not address significant legal questions regarding ERISA, Dial presented a demonstrably stronger or more meritorious case. At least four of the *Bowen* factors support an award of reasonable attorneys' fees and costs to Dial. Accordingly, the Court finds that an award of attorneys' fees and costs would promote ERISA's remedial purpose of protecting beneficiaries.

Our opinion today renders inaccurate the district court's determination that Dial presented a more meritorious case. We note also that any imputation of bad faith in this case to the

-16-

Plan administrators is simply unreasonable. The Plan administrators' decision did not save the Disability Plan any money; the Plan paid the same amount it would have paid under Dial's reading, only to a second beneficiary as well. The Plan administrators had no reason or incentive to interpret the settlement agreement one way or the other. They allowed Dial the opportunity to respond before the Plan began paying benefits to Marye. Moreover, the district court's award of attorneys' fees would have no deterrent effect. The Plan administrators merely chose to interpret an outside document in the way they found correct. Plan administrators must do this with every QDRO they receive. No matter what the outcome of this litigation, punishing the Disability Plan administrators would at most encourage other administrators to interpret documents in favor of the original beneficiary, regardless of a valid QDRO. The only *Bowen* factor favoring attorneys' fees for Dial was the Supplemental Plan's ability to pay, and the district court's opinion mentions no relevant non-*Bowen* factors.

Marye has requested this Court to award her reasonable attorneys' fees for defending her beneficiary rights. Acknowledging that the outcome of this case was a "close call," we direct the district court to consider Marye's request on remand.

VI

-17-

The judgment of the district court is VACATED and the case is REMANDED to the district court for entry of judgment in favor of the defendant/counterclaimant/third-party plaintiff/appellant NFL Player Supplemental Disability Plan in accordance with this opinion. The dismissal of third-party defendant/appellant Janice Marye's community-property claim is AFFIRMED, as the issue is now moot. We direct the district court on remand to consider Marye's request for attorneys' fees.