954 So.2d 225 (2007)
Katherine Gertrude WELKER, Plaintiff-Appellee
v.
Robert Lynn WELKER, Defendant-Appellant.
No. 41,945-CA.
Court of Appeal of Louisiana, Second Circuit.
March 7, 2007.
*227 Dawn Hendrix Mims, for Appellant.
Mason L. Oswalt, for Appellee.
Before STEWART, CARAWAY and DREW, JJ.
CARAWAY, J.
This dispute involves the division between former spouses of the annuity benefits under a state retirement pension and the equitable rule of Hare v. Hodgins, 586 So.2d 118 (La.1991). The plaintiff was an elected official at the time of the termination of the community which occurred over twelve years before her eventual retirement. Post-community, she received substantial legislative increases in her salary as tax assessor, and she claimed a Hare adjustment reducing her former husband's share of the retirement annuity. The trial court determined that the substantial salary increases plaintiff received during her last term in office would not be considered in the calculation of the defendant's share of the annuity because plaintiff's post-community re-election was a meritorious individual achievement implicating an adjustment under Hare. Defendant appeals this ruling and additionally has raised during the pendency of this appeal the peremptory exception of res judicata based upon the parties' execution of a qualified domestic relations order upon rendition of the judgment of divorce. For the following reasons, we reverse the trial court's judgment.

Facts
After twenty-one years of marriage, Katherine and Robert Welker obtained a judgment of divorce on August 9, 1993. The community of acquets and gains ceased on September 17, 1992, the date the divorce petition was filed. The divorce judgment made no partition of the community, only recognizing the parties as owners in indivision of an undivided one-half interest in the community property. Attached to the judgment of divorce and made a part thereof by reference, were two qualified domestic relations orders (QDRO) which allocated the parties' respective community retirement benefits.
Previously, in October of 1991, with the help of Robert, Katherine successfully concluded a campaign against five individuals for the office of Richland Parish Tax Assessor. Because of the untimely death of her father, the presiding tax assessor, Katherine took office on October 20, 1992, two months before her scheduled assumption of duties. Katherine had worked in the assessor's office since 1972 and at the time of her election had been promoted to the position of Chief Deputy Tax Assessor.[1]
*228 During Katherine's employment she participated in the Louisiana Assessors' Retirement Fund. At the date of termination of the community Katherine earned $32,400 in her position as Chief Deputy Assessor. She had attended classes to obtain her certification as a Certified Louisiana Deputy Assessor by the time of her election as tax assessor. Her salary increased to $40,000 when she assumed office and then to $46,000 during 1993 due to a legislatively-enacted salary increase. Two years after her election, Katherine obtained the title of Certified Louisiana Assessor upon taking continuing education courses and received a 7% raise to $49,000. By the end of her first term in 1996, Katherine earned an annual salary of $54,179.64, due to legislative increases. Katherine was re-elected to the position of Tax Assessor in the fall of 1995 and assumed office on January 1, 1997. During her second term of office, legislative salary increases resulted in substantial raises for Katherine. By the end of her second term she earned $82,390.08 annually. Although Katherine did not seek re-election after her second term in office, she was named Chief Deputy Tax Assessor in 2001 with a yearly salary of $50,400.
In March of 2002, Katherine entered into the State Assessors' Deferred Retirement Option Plan (hereinafter "DROP").[2] Although she retired in 2005, at the time of trial, she continued to work part-time for the tax assessor's office and received $30.00 per hour and complimentary full health insurance benefits. The Louisiana Assessors' Retirement Plan is a defined benefit plan which provided for taking an average of the three highest salary years for a calculation of monthly benefits. For Katherine, her three highest years salaries occurred in 1998, 1999 and 2000 and averaged $78,466.67.
In December of 2004, Katherine filed a Petition for Supplemental Partition in which she alleged that not all of the parties' community assets were partitioned, particularly that portion of Katherine's retirement plan which accrued after the dissolution of the community. In relevant part, Katherine argued that extraordinary post-marital enhancements to her salary should not be credited to the community in accordance with Hare v. Hodgins, supra. Specifically, Katherine proposed that her election as Tax Assessor and the resultant salary increases were due to her own efforts rather than normal cost-of-living increases or salary raises that related to the length of employment. Thus, she sought a recalculation of benefits based upon her pre-September 17, 1992 salary as Chief Deputy Assessor.
Following trial, the trial court rendered judgment in favor of Katherine modifying the state retirement plan's calculation of benefits. Instead of using the $78,466.67 average salary amount employed by the retirement plan, the court chose $54,179.64 for the salary factor for the community, which was Katherine's salary at the end of her first term. The court ruled:
But for her re-election, it [the higher average salary] would not have happened. Re-election is not an automatic event. It has to be earned. Unlike a cost-of-living raise, it comes as the result of meritorious individual efforts or achievement.

*229 * * *
Likewise, in the case at hand, the court finds that the Hare exception should apply in this case, and that the base for calculating Robert's interest in Kathy's retirement benefit should be the $54,179.64 she was earning in 1996, rather than the higher $78,466.67 three-year average she achieved during her second term.
Robert has appealed the trial court's judgment. While the appeal was pending, Robert filed with this court the peremptory exception of res judicata, claiming that the QDRO rendered in 1992 bars the Hare adjustment to his interest in Katherine's pension.

Community Pension Partition Law
Both issues in this appeal  the peremptory exception of res judicata and the substantive ruling by the trial court allocating Katherine's pension benefits  will turn on the Louisiana Supreme Court's rulings in Sims v. Sims, 358 So.2d 919 (La.1978), and Hare v. Hodgins, supra. Significantly, like the present case, both decisions involved an employee spouse's defined benefits pension.[3] At the termination of the community in Sims and Hare, the employee spouses were not retired so that neither enjoyed a fully matured pension. The court gave a later summary of its Sims and Hare rulings in Blanchard v. Blanchard, 97-2305 (La.1/20/99), 731 So.2d 175, 179-180, as follows:
This Court has recognized two methods of apportioning pension rights. In Sims v. Sims, 358 So.2d 919 (La.1978), we held that the proper method of apportioning the particular unmatured defined benefit plan at issue was to apply the "reserved jurisdiction" or "fixed percentage" methodology, which defers benefit distribution to the non-employee spouse until commencement of benefit distribution to the employee spouse. Use of the "fixed percentage" method does not require valuation of the pension. Disposition of pension rights under this method involves recognition of the right of the non-employee spouse to a judgment recognizing his interest in proceeds from a retirement plan, "if, as, and when" they become payable, usually in the form of a Qualified Domestic Relations Order ("QDRO"). Id. at 922; [citations omitted]. Application of the fixed percentage method is typically called for when the present value of the pension cannot be accurately ascertained. Hare, supra, 586 So.2d at 125. Plaintiff, in requesting that defendant be required to share in the pension rights "if, as, and when" she does by virtue of a QDRO, urges the application of Sims to allocate the pension at issue.
Subsequent to our holding in Sims, however, we recognized in Hare v. Hodgins, supra, that the fixed percentage method of distribution was not the exclusive method by which unmatured pension rights could be allocated upon divorce. Hare, 586 So.2d at 126 (acknowledging that, to the extent Sims could be interpreted to mean that pension rights could not be valued prior to maturity, such a conclusion was error). In Hare, we commented on the interplay between LSA-RS 9:2801 and pension jurisprudence, stating that LSA-RS 9:2801, enacted *230 after our decision in Sims, affords the trial court much flexibility and implies that the "goals of equality and equity require that no one method should be used to the exclusion of other apportionment techniques." 586 So.2d at 127.
Consequently, in Hare, we cited with approval the use in certain cases of the "present cash value" methodology, in which the court calculates the present cash value of the community assets, including pension rights, and awards to the non-employee spouse his rightful share in a lump sum or in the form of equivalent property. Id. at 124-25. Such a disposition of the pension rights effects an immediate transfer to the non-employee spouse his equivalent share of the pension. In an effort to aid trial courts in determining which of these two methods would result in the more equitable distribution of the pension rights, Hare cited with approval the decisions of courts in other jurisdictions which prefer application of the present cash value method if the pension rights "can be valued accurately and if the marital estate includes sufficient equivalent property to satisfy the claim of the non-employee spouse without undue hardship to the employee spouse." Id. at 125 (emphasis added). The present cash value method of apportionment was undertaken by the trial court in this case and is the method which defendant urges is appropriate in light of our decision in Hare.

The Hare ruling also opened the door for consideration of significant accomplishments by the employee spouse after termination of the community which serve to greatly enhance the retirement benefit. The court stated:
The community should not be given credit when a substantial post-community increase to a retirement fund is due to a singular personal factor such as individual effort, education or achievement resulting in a merit raise or an extraordinary promotion or series of promotions. For example, such an increase in benefits might occur where the employee spouse attains a significantly higher-paying position while remaining within the coverage of the same pension plan, either through earning a post-community degree, or transfer within the company to an unrelated area of service.
586 So.2d at 128. The legal basis for this Hare adjustment of the straight-line proportionate community sharing of a defined benefit annuity was expressed in Hare as follows:
The general rules for the partition of community property, however, do not address all of the problematic ramifications of classifying, valuating and distributing each spouse's interest in pension benefits which have been earned by one spouse partly during the marriage and partly before or after. In such cases, the pension benefits are composed of the separate property interest of the employee spouse in addition to the community interest. Furthermore, there is no custom from which rules can be derived for each particular situation. Accordingly, in the present case and others a court is bound to proceed and decide equitably to some extent, making resort to justice, reason and prevailing usages. La. Civ.Code art. 4.
586 So.2d at 123.
Under the present ruling of the trial court, Robert's community fraction of Katherine's state retirement pension remained unchanged, being one-half of the time period of the community (20-1/2 years) divided by Katherine's total creditable service years of employment (approximately 31 years). The trial court made a *231 Hare adjustment to the average salary component of the state retirement plan. The salary base otherwise employed in the state's computation of the retirement annuity was lowered for the determination of Robert's share of the annuity benefits.
Although Hare appears to allow for the possibility of the present cash value method of valuation of unmatured defined benefit plans in the partition of the community, the contingencies affecting valuation of such plans prior to their maturity remain problematic. The Sims court's finding that the unmatured defined benefits plan was contingent, "non-merchantable," and "inchoate" before the accrual of future events in the work-life of the employee was not discredited by Hare. Recognizing this situation for the present pension in 1992, the parties chose to merely declare Robert's interest in Katherine's pension benefits, "if, as, and when" benefits became payable.

Discussion

I.
The peremptory exception of res judicata, first filed in this court, raises the question of the effect of the qualified domestic relations order attached to the judgment of divorce in 1992. The QDRO is the product of the federal law regulating pension plans and the taxability of retirement plan distributions. 29 U.S.C. § 1056 (ERISA) and 26 U.S.C. § 414 (I.R.C.); Boggs v. Boggs, 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) ("A QDRO is a limited exception to the pension plan anti-alienation provision and allows courts to recognize a nonparticipant spouse's community property interest in pension plans under specific circumstances.") The order involves a state court directive to an ERISA plan administrator. Dial v. NFL Player Supplemental Disability Plan, 174 F.3d 606 (5th Cir.1999); Beskin, supra.
The 1992 QDRO involving Katherine's state pension was signed by Katherine and Robert and the trial court. Significantly, the order did not stem from a pending pleading before the trial court. There was also no pending action for partition of the community, as the divorce judgment merely acknowledged that the parties were to remain as co-owners of the community subsequent to the divorce. We note that the 2004 pleading by Katherine raising this claim under Hare identifies a written compromise and amicable settlement of the community. Whether the 1992 QDROs were executed by the parties in conjunction with that settlement is unclear. Robert does not assert an overall compromise partition as the basis for res judicata, but merely raises the signed QDRO as the authority for the thing adjudged.
The QDRO designates Robert as the alternate payee of Katherine's retirement plan, assigning to him benefits of her plan. It identifies the 20-1/2-year period of the parties' community property regime. The QDRO sets forth the Sims formula for the so-called "fixed percentage" method for the ultimate distribution of Katherine's defined benefit annuity. Yet, Katherine's "total credible service" period is listed "still not determined" as in Sims and the amount of the annuity was also undeterminable. While the QDRO did provide for Robert's share of survivor benefits in the event of Katherine's death before her retirement, it did not address specifically the possibility of a Hare-type increase in the retirement annuity benefit due to a singular personal factor from Katherine's accomplishments post-community. Finally, we note that in certain language the QDRO allows instances for adjustment for events that might call for the recalculation of benefits or through court modification of the QDRO's effect.
*232 The authority of the thing adjudged (res judicata) takes place only with respect to what was the object of the judgment. Page v. City of Winnfield, 40,747 (La.App. 2d Cir.3/10/06), 925 So.2d 683. A valid compromise can form the basis of a plea of res judicata because a compromise has the legal efficacy of a judgment. Cason v. Cason, 38,974 (La.App. 2d Cir.10/27/04), 886 So.2d 628; La. C.C. art. 3078. A consent judgment is a determination of the rights of the parties and acquires the authority of the thing adjudged. Thibodeaux v. Thibodeaux, 511 So.2d 102 (La.App. 3d Cir.1987) and cases cited therein.
The doctrine of res judicata is strictly construed. Any doubt regarding compliance with its requirements is to be resolved in favor of maintaining the plaintiff's action. Thurston v. Thurston, 31,895 (La.App. 2d Cir.8/20/99), 740 So.2d 268. The party urging the exception has the burden of proving each essential element by a preponderance of the evidence. Id.
La. C.C.P. art. 2163 affords a party the opportunity to raise peremptory exceptions, such as res judicata, for the first time in the appellate court. However, the article specifically states that for such an exception to be considered "proof of the ground of the exception" must appear of record. Id. The article does allow for remand of the case to take evidence on the exception if it is based on prescription. Id. Article 2163 is clear and unambiguous: if grounds of the exception of res judicata do not appear in the record, the exception cannot be considered for the first time in the appellate court and must be denied. Smith v. State, Dept. of Transp. & Development, 04-1317 (La.3/11/05), 899 So.2d 516.
Exceptions to the general rule of res judicata are found in La. R.S. 13:4232 which reads as follows:
A. A judgment does not bar another action by the plaintiff:
(1) When exceptional circumstances justify relief from the res judicata effect of the judgment;
(2) When the judgment dismissed the first action without prejudice; or,
(3) When the judgment reserved the right of the plaintiff to bring another action.
B. In an action for divorce under Civil Code Article 102 or 103, in an action for determination of incidental matters under Civil Code Article 105, in an action for contributions to a spouse's education or training under Civil Code Article 121, and in an action for partition of community property and settlement of claims between spouses under R.S. 9:2801, the judgment has the effect of res judicata only as to causes of action actually adjudicated.
From our review of the process by which the parties obtained the QDRO, which included no pleadings for the order and no related partition of the community, we view the parties' action as the result of a compromise. In particular, by choosing the Sims or fixed percentage method of dealing with Katherine's retirement plan, the parties agreed by compromise that the present cash value method of valuation of the unmatured pension benefits would not be claimed by either party in any subsequent partition action. Significantly, the parties' choice for the fixed percentage valuation of Katherine's pension is also referred to as the "reserved jurisdiction" methodology. Blanchard, supra. Under the "reserved jurisdiction method," the court determines the formula for division at the time of the decree but delays the actual division until payments are received, retaining jurisdiction to award the appropriate percentage of each pension payment *233 if, as and when, it is paid out. Beskin, supra at 681. Citing Hare, this court in Withers v. Withers, 27,348 (La.App. 2d Cir.9/27/95), 661 So.2d 529, 533, observed that "[w]hen the fixed percentage method is used, the formula for dividing the retirement benefits may be determined before the benefits become payable, notwithstanding that the retirement fund is not actually divided or partitioned until benefits are paid upon the employee spouse's retirement." [Emphasis added.]
The parties' apparent compromise which led to their execution of the QDROs should be considered in view of two recent supreme court cases where the partitions of the communities did not definitely address pension rights. Robinson v. Robinson, 99-3097 (La.1/17/01), 778 So.2d 1105; Jennings v. Turner, 01-0631 (La.11/28/01), 803 So.2d 963. In both cases the partitions contained omnibus clauses for the general divestiture of all community assets and the waiver of further accounting relative to any community property not specifically listed in the partitions. Nevertheless, the court refused to allow the omnibus clauses to resolve the unaddressed pension rights. Central to the rulings was the following:
When the agreement does not expressly address the employee spouse's pension, the issue of whether the agreement divests the non-employee spouse of any community property rights in the pension depends on the intent of the parties.
Robinson, supra at 1121.
From a similar perspective, we do not find that the parties' recognitive agreement in the form of the QDRO evidences on its face their intent to settle and preclude any future event that might allow for a Hare adjustment for their sharing of Katherine's retirement benefits. A Hare adjustment to the "annuity," which was undeterminately listed in the QDRO, remained a possibility affecting the ultimate amount of the annuity in the same manner that future salary increases and the date of retirement or death would serve to determine the actual annuity payments to the parties. With the burden of proof for the exception of res judicata on Robert, we find that the exception of res judicata was not proven.

II.
Regarding application of Hare v. Hodgins to the facts of this matter, Robert argues that Katherine's salary increases were solely attributable to legislative acts and not personal effort or achievement. Stated somewhat conversely, Robert also argues that even if Katherine's re-election to office might be considered a "personal achievement," that achievement was unrelated to the salary increases.
Hare established a three-part test for the partitioning court to apply in determining whether or not a substantial post-community increase is due purely to personal merit. First, the increment must represent a fairly substantial increase in the employee spouse's post-community earnings. Second, the increment must not be due to non-personal factors, such as cost of living raises, etc. Third, the increment must be attributable to the employee spouse's meritorious individual efforts or achievements. Bullock v. Owens, 35,078 (La.App. 2d Cir.9/26/01), 796 So.2d 170.
The facts regarding Katherine's salary as the tax assessor show that in her first term her annual salary increased from $40,000 to $54,179.64, or an increase of 35%. We do not find that the increase attributable to her obtaining the Certified Louisiana Assessor status would be an extraordinary accomplishment under Hare, and neither did the trial court. In her second term, the legislature sharply raised the salaries of tax assessors to $82,390.08. *234 Katherine's three highest years of salary, which are utilized in the State's annuity formula, occurred during her second (and last) term and averaged $78,466.67. For retirement purposes, the legislative enhancement of her salary during her second term therefore amounted to a 45% increase for that term. It was this salary increase which the trial court treated as an extraordinary post-community enhancement.
Reviewing these numbers in its opinion, the trial court did not award the Hare adjustment based upon these legislative increases. The opinion recognizes that regardless of the size of the increases (which were more than mere cost of living raises), they were "across-the-board raises given to all Tax Assessors." We agree with the assessment that the legislature's action is a non-personal factor that does not warrant a Hare adjustment.
The focus of the trial court's ruling was on Katherine's re-election as tax assessor in 1996. The evidence revealed that she faced opposition and was re-elected.[4] Nevertheless, what was also expressly recognized by the trial court's ruling was that Katherine had first obtained the office of tax assessor in an election that occurred during the community. That event and the 20-1/2-years of service in the tax assessor's office as a deputy were the foundational community work accomplishments that earned Katherine the important elective office obtainment before the community ever ended. In view of those considerable community-related accomplishments, we find that Katherine's post-community re-election did not add significantly to her work-life status and represent the degree of extraordinary accomplishment required for the equitable remedy afforded under Hare.

Conclusion
Accordingly, we reverse the judgment of the trial court and dismiss Katherine's claim. Costs are assessed to appellee.
REVERSED.
NOTES
[1] Robert began work at General Motors in 1976 and contributed to the GM retirement system during his thirty years of work with the company. He testified that he was seeking to retire from the company as of March 2006.
[2] DROP allows a state employee to change from an active member to a retiree for up to three years, even though she continues to work at her regular job. During her participation in DROP, the employee accumulates money in an individual account based on what she would have received as a monthly retirement benefit and continues to earn his regular salary. She can withdraw the money from the DROP account after she ends state employment, either as a lump sum or a series of payments spread out over time.
[3] A defined benefit plan provides a participant employee with definitely determinable benefits upon attaining retirement age. Elizabeth Alford Beskin, Retirement Equity Inaction: Division of Pension Benefits Upon Divorce in Louisiana, 48 La.L.Rev. 677 (1988). For the governmental pensions in Sims and the present case, the annuity is not directly tied to employee contributions but is based on a percentage of average pay during employment.
[4] The details of Katherine's two elections were that, in the first, she faced six opponents and was in a runoff, while in the second, she had one challenger and won with 60% of the vote. We do not find these details however relevant to our ruling.