778 So.2d 1105 (2001)
June Coleman, Wife of Leslie Leon ROBINSON, Jr.
v.
Leslie Leon ROBINSON, Jr.
No. 99-C-3097.
Supreme Court of Louisiana.
January 17, 2001.
Opinion on Rehearing Denied March 16, 2001.
*1109 Richard A. Hinckley, Philip Riegel, New Orleans and Terri L. Young, Counsel for Applicant.
Chris Troy, Terence L. Hauver, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans; Marynell L. Piglia, New Orleans, Counsel for Respondent.
JOHNSON, J.[*]
We granted writ of certiorari in this case to determine whether an agreement to partition community property must be construed using North Carolina law, as provided in the contract, or whether Louisiana has a more compelling interest in *1110 applying its own law. We also address whether a husband is obligated to designate his former wife as beneficiary of the survivor's annuity once his obligation to pay alimony has terminated. After a considered review of the record, applicable law, and both Louisiana and North Carolina jurisprudence, we reverse the decisions of the lower courts and remand.

FACTS AND PROCEDURAL HISTORY
Plaintiff, June Coleman, and defendant, Leslie L. Robinson, Jr., were married on June 30, 1955. Mr. Robinson was employed by the federal government as an administrative law judge and was transferred on several occasions. The parties were domiciled in the states of Wyoming, Texas, California and Virginia for various periods of their marriage, but spent the majority of their marriage in Louisiana. When the parties separated in January of 1986 they had been living in Louisiana since 1978. Ms. Coleman filed a Petition for Separation based on abandonment in the Orleans Parish Civil District Court on February 14, 1986 and a judgment was rendered in her favor on March 26, 1986. It was at this point that their community of acquets and gains was terminated. The parties divided the movables manually and sold the former matrimonial domicile. The revenue from that sale was equally divided between them. There was never an itemization of any assets or liabilities, and no values were ever assigned to any property in the partition.
Mr. Robinson subsequently established a residence in North Carolina, while Ms. Coleman remained in Louisiana. In December of 1986, Mr. Robinson filed for divorce in the Orleans Parish Civil District Court. After months of correspondence between the parties, it became clear that Ms. Coleman was hesitant to move to final judgment. In a letter dated April 24, 1987, addressed to Ms. Coleman, Mr. Robinson wrote:
After talking to you today I have given a good deal of thought to the difficulty in getting this divorce finalized. I realize you do not want to have to go to Court and do this and I suppose I understand that. At the same time, I do not want to have to return to New Orleans in order to get it done.... Therefore in order to give you an alternative, I have contacted an attorney here who is willing to handle the matter. He is going to file a divorce action here and forward the papers to your attorney. You will not need to do anything other than sign a few papers. The property settlement and alimony settlements will remain the same and will be attached to the judgment [sic].
Instead of pursuing the Louisiana divorce to a conclusion, Mr. Robinson filed for divorce in Mecklenberg County, North Carolina and obtained a default judgment on July 20, 1987. Robinson v. Robinson, No. 87-5782, slip op. (N.C. Dist.Ct. 1987). One month after the judgment, the parties entered into the Separation, Support, and Property Settlement Agreement ("Agreement") drafted by North Carolina counsel for Mr. Robinson.[1] Unlike the previous "New Orleans draft," the Agreement did not mention any community property which previously had been divided between the parties and substituted North Carolina law for Louisiana law to control the agreement.[2] The Agreement contained the following relevant provisions:

*1111 Paragraph 3.
The Wife, for herself, her heirs, executors, administrators, and assigns, hereby releases and relinquishes unto the Husband, his heirs, executors, administrators, and assigns, all right of future support, all right of dower, inheritance, descent, and distribution, and right to dissent from his will, and any and all other rights arising out of their marriage relationship, and to any and all property or interest in property, real, personal, and mixed, now owned or hereafter acquired by Husband, and hereby agrees that Husband henceforth may acquire, hold, manage, alienate, lease, and convey his property without her knowledge, further consent, or joinder, in accordance with the provisions of law, the same as if she never had been married to him, and further does hereby release, relinquish, and renounce any and all right to administer upon his estate.
* * *
Paragraph 7.
Husband and Wife have accomplished a complete liquidation and division of their property in full settlement of all of their property rights, whether arising out of the equitable distribution statute (N.C.G.S. 50-20, etc.) or under the community of acquets and gains laws in the State of Louisiana, or any other provision of the law of any other jurisdiction, statutory or otherwise, and hereby ratify the division of such property, and agree that the same amounts to an equitable division of their property.
* * *
Paragraph 13.
This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina. This agreement shall continue in full force and effect even though one of the parties hereto may secure an absolute divorce from the other party subject only to the contingencies and limitations specifically enumerated herein.
Following the signing of the Agreement, the parties' legal relationship ended without further contact concerning the community. Ms. Coleman remarried in 1988 and Mr. Robinson remarried in 1989. Mr. Robinson retired in December, 1992 and began receiving his retirement benefits in 1993. Under the pension plan, his present wife is the designated beneficiary of the survivor benefits. In December of 1993, defendant filed a complaint in the North Carolina court seeking a declaratory judgment that plaintiff had no rights in his pension benefits. The complaint was dismissed by the North Carolina trial court for lack of personal jurisdiction, and affirmed by the North Carolina Court of Appeals. Robinson v. Hinckley, 119 N.C.App. 434, 458 S.E.2d 715 (1995).
On January 18, 1994, Ms. Coleman filed a Petition for Supplemental Partition, seeking a division of her former husband's pension benefits that were not partitioned *1112 in the property settlement. She followed her original petition with supplemental petitions seeking: (1)enforcement of the provision of the agreement in which defendant agreed to designate plaintiff as recipient of the survivor benefit, plus attorney's fees provided for in the agreement; and (2) a determination that defendant's actions and silence amounted to fraud, bad faith, and a breach of fiduciary duty, entitling plaintiff to damages and attorney fees and, alternatively, to a recision of the partition based on fraud. Mr. Robinson answered the petition and filed a Motion for Declaratory Judgment, Motion for Summary Judgment, and a Memorandum in Support for Summary Judgment.
A hearing was held in Civil District Court on December 1 and December 2, 1997, on the Motions for Declaratory Judgment and Summary Judgment filed by defendant and plaintiffs demand for supplemental partition. On December 15, 1997, the trial court rendered judgment in favor of the defendant, granting his Motion for Declaratory Judgment. The court found that "North Carolina governs any and all issues involving the Separation, Support, and Property Settlement Agreement (`Agreement') executed by the parties on August 27, 1987." On February 5, 1998, the trial court rendered judgment with reasons, dismissing plaintiff's petition for supplemental partition with prejudice.[3] Plaintiff filed a Motion for New Trial that was argued on March 25, 1998. Ms. Coleman argued that the court failed to rule on her request for enforcement of the agreement with respect to the survivor's annuity. On April 1, 1998, the court rendered an amended judgment that denied Ms. Coleman's petition.
Ms. Coleman appealed to the Fourth Circuit Court of Appeal. Coleman v. Robinson, 98-1874 (La.App. 4 Cir. 9/1/99), 746 So.2d 65. The court of appeal affirmed the ruling of the trial judge, finding that "[t]he contractual choice of law is expressly set forth in the agreement. By the clear and unambiguous language of the Separation, Support, and Property Settlement Agreement, the parties agreed that North Carolina law would apply to the interpretation of the agreement." Accordingly, the court of appeal concluded that the trial court did not err in determining that North Carolina law controlled the agreement, nor did it err in its construction and application of North Carolina law. The court of appeal upheld the decision denying supplemental partition of defendant's pension plan. The court also denied plaintiff relief on her claim seeking to have defendant name her as beneficiary of his annuity because the court reasoned, "the purpose of Mr. Robinson having to choose Option B was to provide his former wife with some sort of income to replace the alimony she would lose should he predecease her. When plaintiff remarried, however, defendant was no longer required to chose Option B of the retirement plan." Finally, the court of appeal upheld the trial court's finding that there was no fraud, bad faith, or breach of duty on the part of Mr. Robinson. Judge Katz, dissenting, would have reversed the decision of the trial court as it relates to the partition of the federal pension benefits.
Plaintiff seeks review of this decision and assigns four errors. They are:
1. The lower courts erred in giving effect to the North Carolina choice of law provision in the agreement and further erred in their construction and application of North Carolina law to the agreement.
2. The Court of Appeal erred in affirming the trial court's denial of [plaintiff's] right to be designated as beneficiary of the survivor annuity, as clearly provided for in the Agreement.
3. The lower courts erred in failing to find that [defendant] breached his fiduciary *1113 duty to [plaintiff] and that his silence and actions amounted to fraud and bad faith entitling [plaintiff] to damages and attorney's fees.
4. The lower court erred procedurally in granting a declaratory judgment.
We granted this writ of certiorari to determine whether Louisiana or North Carolina law should be applied to determine the ownership rights in this pension plan. Coleman v. Robinson, XXXX-XXXX (La.1/14/00), 752 So.2d 877. Specifically, we must decide whether using general divestiture language in a partition settlement agreement has the effect of transferring one spouse's interest in a pension plan to the other where the pension was not specifically divided in the Agreement; and whether termination of alimony affects a husband's obligation to designate his former wife as beneficiary of the survivor's annuity.

DISCUSSION

PART I: LOUISIANA COMMUNITY PROPERTY LAW
Louisiana Civil Code article 2325 defines the matrimonial regime as "a system of principles and rules governing the ownership and management of the property of married persons as between themselves and toward third persons." A matrimonial regime may be legal, contractual, or partly legal and partly contractual. La. Civ.Code art. 2326. There is a presumption in the law that all married persons living in Louisiana are under the legal regime of acquets and gains (community property). Our community property laws apply to spouses domiciled in this state, regardless of their domicile at the time of marriage or the place of celebration of the marriage. La.Civ.Code art. 2334.
However, married persons are also given the opportunity to establish another regime other than the legal regime of acquets and gains during the first year after moving into and acquiring a domicile in this state, spouses may enter into a matrimonial agreement without court approval. La.Civ.Code art. 2328. Spouses are also free to establish by matrimonial agreement[4] a regime of separation of property or modify the legal regime as provided by law. Id. Moreover, spouses may enter into a matrimonial agreement before or during marriage as to all matters that are not prohibited by public policy. La.Civ.Code art. 2329.
Under Louisiana law, property is characterized as either community or separate. La. Civ.Code art. 2335. Property acquired during the existence of the community is presumed to be community, but either spouse may rebut the presumption and prove the separate nature of said property. La. Civ.Code art. 2340. The classification of property as separate or community is fixed at the time of its acquisition. Smith v. Smith, 95-0913 (La.App. 1st Cir.12/20/96), 685 So.2d 649. Pursuant to La. Civ.Code art. 2338, community property is comprised of: property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property under Article 2341; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate property.
Conversely, La.Civ.Code art. 2341 provides, in pertinent part, that a person's separate estate is comprised of: property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison *1114 with the value of the separate things used; property acquired by a spouse by inheritance or donation to him individually; damages awarded to a spouse in an action for breach of contract against the other spouse or for the loss sustained as a result of fraud or bad faith in the management of community property by the other spouse; damages or other indemnity awarded to a spouse in connection with the management of his separate property; and things acquired by a spouse as a result of a voluntary partition of the community during the existence of a community property regime.
In the present case, Ms. Coleman, and Mr. Robinson were domiciled in Wyoming, Texas, California and Virginia for various periods of their marriage. However, the majority of their marriage was spent in Louisiana. When they moved to Louisiana they had a period of one year to declare a legal regime. The record indicates that the couple failed to establish any legal regime by matrimonial agreement. Thus, Ms. Coleman and Mr. Robinson subjected themselves to the laws of community of acquets and gains or community property.

CLASSIFYING PENSION RIGHTS AS COMMUNITY OR SEPARATE PROPERTY
The main inquiry in this case is whether Ms. Coleman is entitled to a portion of the pension benefits of her ex-husband Mr. Robinson. The pension benefits must be correctly identified before we can determine Ms. Coleman's rights, if any.
Before an asset can be classified as community or separate, it must first be identified as "property." K. Spaht and L. Hargrave, Matrimonial Regimes, 16 Civil Law Treatise § 2.1 (1989 & Supp.1991) [hereinafter "Spaht & Hargrave"]. This court decided in T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La.1975) that an employee's contractual pension right is not a gratuity but a property interest earned by him.
To the extent that the right derives from the spouse's employment during the existence of the marriage, it is a community asset subject to division upon dissolution of the marriage. La.Civ.Code art. 2338; Sims v. Sims, 358 So.2d 919 (La. 1978); T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La.1975). Consequently, when the community is terminated, the employee's spouse is entitled to be recognized as the owner of one-half of the value attributable to the pension or deferred compensation right earned during the existence of the community. La.Civ. Code art. 2336; La.R.S. 9:2801 (1991); Sims, supra at 923-24; T.L. James & Co., supra; see generally, Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169 (1956); Moon v. Moon, 345 So.2d 168 (La. App. 3d Cir.) writ denied, 347 So.2d 250 (La.1977); Swope v. Mitchell, 324 So.2d 461 (La.App. 3d Cir.1975); Lynch v. Lawrence, 293 So.2d 598 (La.App. 4th Cir.) writ denied, 295 So.2d 809 (1974); Laffitte v. Laffitte, 253 So.2d 120 (La.App. 2d Cir. 1971). Correlatively, if part of the employee's pension right was earned before or after the existence of the community, that part of the pension right must be classified as the employee's separate property (or as property of a different marital regime) and separated from the community property interest to be divided. La.R.S. 9:2801 (1991); T.L. James & Co., Inc. v. Montgomery, supra.
As a general principle, a court partitioning a community asset is required to classify the property as of the date of the termination of the community. La.Civ. Code arts. 2338-2341; La.R.S. 9:2801 (1991); K. Spaht & L. Hargrave, supra, §§ 7.25, 7.26. In the case of a pension right earned partly during and partly outside of the community, the process of classification begins at the termination of the community and continues until a partition of that asset is effected. Because the community interest in the pension right is an *1115 incorporeal[5] that may accrue or appreciate over time, or fluctuate in proportion to the employee spouse's separate property interest in the pension, the community and separate fractions of the pension cannot be separated and classified definitively until the partition.
Mr. Robinson was employed by the federal government as an administrative law judge, and entitled to a U.S. Civil Service Retirement Annuity. In December of 1992, he retired and began receiving pension benefits.
During Mr. Robinson's career and some portions of his marriage to Ms. Coleman, the pension benefits accrued as community property, belonging to both parties equally. When the community was terminated by the separation judgment in Louisiana, plaintiff and defendant became fully vested co-owners in indivision of all property of the former community regime, including Mr. Robinson's pension benefits acquired during the community. After the North Carolina divorce decree, their positions remained unchanged. The move to North Carolina by defendant, and the judgment of divorce in North Carolina did not alter or affect the substantive right of plaintiff to her ownership interest in the pension.

SIGNIFICANT CONTACTS
In deciding whether Louisiana or North Carolina law should be used to construe the partition agreement we are guided by article 3515 of the Louisiana Civil Code. LA.CIV.CODE art. 3515 provides:
Except as other wise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
Louisiana citizens, not wanting to follow Louisiana's law of conventional obligations, enjoy qualified party autonomy in their choice of law. Thus LA.CIV.CODE art. 3537 provides:
Except as otherwise provided in this Title, an issue of conventional obligations is governed by the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved state in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.
Based upon these codal dictates, it is axiomatic that enforcement of the extrajudicial partition must begin with a consideration of conflict of law principles on conventional obligations to determine which *1116 state's law will apply under article 3537 and then whether adherence to the parties' choice of law in the case sub judice would contravene the public policy of the state as provided by article 3540[6].
Accordingly, North Carolina's contacts with these parties and their community property settlement are tenuous, at best. Applying articles 3537 and 3515 to determine the connection of these two state' contacts with the parties, we note that, although the judgment divorcing the parties was rendered in North Carolina, the parties never established a matrimonial domicile within that state. In stark contrast, the parties' last matrimonial domicile was Louisiana, a domicile that they maintained for the last several years of their marriage. While Ms. Coleman remained in Louisiana, Mr. Robinson alone lived in North Carolina and then, only for a short time before moving to Mississippi and later, Tennessee. In fact, when this case was filed, Mr. Robinson no longer had any connection or contact with North Carolina.
In consideration of the connection of these two states to the Agreement, we note that, although the agreement was negotiated both in Louisiana and in North Carolina, the majority of the negotiations took place in Louisiana as Mr. Robinson acted through his New Orleans attorney before finalizing the agreement through his laterhired North Carolina attorney. Further, the Agreement purported to divide and distribute the property that the parties partially acquired while living in Louisiana, none of which has a North Carolina connection. In fact, the parties divided their movables and sold the former matrimonial domicile before Mr. Robinson left Louisiana for North Carolina. Therefore, performance was partially effected in Louisiana before North Carolina's interest in the settlement, however small, came into existence.
A final consideration in these articles, as they apply to this case, is protecting one party from the undue imposition of the other. Partition agreements deal with issues of paramount significance to the parties involved and to society.[7] An overriding consideration is the necessity to safeguard economically and politically disadvantaged spouses from a former spouse who possesses more education and savvy in the business negotiation realm. Negotiated within the context of marriage dissolution, community property partitions differ substantially from the usual arm's length negotiations between strangers.[8] To this end, such partitions are glaringly inconsistent with the sharing principles that existed in the now dissolved marriage.[9]
Therefore, the law has effectuated safeguards to combat these inequities. Louisiana has in place such safeguards to protect Ms. Coleman. As a result of Louisiana's significant connection to the parties and their Agreement, Louisiana law must be applied to construe this Agreement and we must classify the pension benefits attributable to the community from the time the parties were domiciled in Louisiana until the Judgment of Separation as community property.

LOUISIANA'S PUBLIC POLICY
Under the cited jurisprudence, it is clear that Louisiana has a very strong public policy supporting the concept of community property whereas North Carolina *1117 law[10] has no public policy supporting community property. It also follows that the public policy of Louisiana in protecting the rights of the non-employee spouse in the pension benefits attributable to the service while domiciled in Louisiana is superior to any interest of North Carolina. It is equally obvious that Mrs. Robinson acquired an incorporeal movable right to one-half of the federal pension benefits attributable to the time they resided in Louisiana and [98-1874 La.App. 4 Cir.] up until the Judgment of Separation in 1986 notwithstanding the fact that Mr. Robinson did not begin receiving any pension benefits until 1993. As such, while parties are free to choose the state law to be applied, this choice may not contravene established public policy.
Moreover, community property laws are for the purpose of recognizing the non-financial contributions of the non-employed spouse to the family's well-being. Accord Boggs v. Boggs, 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997). By choosing North Carolina law, the policies behind community property in Louisiana are impaired. As Judge Robert Katz, so clearly recognized in his cogent dissent,
Mr. Robinson is not the first to have tried to disenfranchise an ex-spouse of her interest in the settlement of community property. As long ago as 1919 the argument was made to the Supreme Court of Louisiana in Succession of Popp, 83 So. 765, 768, 146 La. 464 (1919) that: "If married people of this state change their domicile to another state where the law of community of acquets and gains does not prevail, the wife ipso facto loses her rights to the community property, which becomes at once the husband's separate property."
The Supreme Court responded with this sobering observation: "If this is so, husbands have at their disposal an easy method of transferring to themselves the interest of their wives in community property. All they have to do is to go and live at Bay St. Louis, Pass Christian, Biloxi, or some other place on the Mississippi coast. The proposition is startling to say the least." Succ. of Popp, supra, at 768.
In the case sub judice, Mr. Robinson has merely exhibited a new twist on an old scheme in an attempt to deprive his exspouse of her interest in the federal pension. And it is equally obvious that the North Carolina courts are not going to condone or bless these legal machinations.
Coleman, supra, at 5. Nor will we.
A husband may not divest a wife of her interest in property by choosing a state law that may benefit his interests to the detriment of his spouse. While a choice of law is permissible, it should have some inherent link to the contracting parties. To choose a state's law that would unfairly benefit one spouse over another, absent some significant connection to that state is not just, and more importantly, against the public policy of our state. Enforcing a state law that only tangentially relates to the parties allows unfair manipulation of differing state laws. Particularly in this case, North Carolina has very little to do with the parties and their interests.[11] Mr. Robinson was domiciled *1118 in North Carolina briefly. After his short tenure as a resident in North Carolina, he moved to Mississippi, and then to Tennessee. Thus, we will not give effect to the North Carolina choice of law provision in the Agreement.

DIVIDING THE PENSION RIGHTS
The general rules provided by law for partitioning community property are, of course, applicable to dividing a community pension right. Each spouse owns a present undivided one-half interest in the community property. La.Civ.Code art. 2336. When the spouses are unable to agree upon an equal partition of community property, either spouse may bring an action to effect such a partition. La.Civ. Code arts. 807, 1289 and 1308; La.R.S. 9:2801. See also 1 Planiol, Traite Elementaire De Droit Civil, Nos. 2497 et seq. (11th ed. La.St.L.Inst. trans. 1959). In allocating the community assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court must consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant. La.R.S. 9:2801(4)(c).
The court is required to divide the community assets and liabilities so that each spouse receives property of an equal net value. La.R.S. 9:2801(4)(b). In order to avoid an unequal net distribution of assets and liabilities, the court may order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon specified terms and conditions; and the court may order the execution of notes, mortgages, or other documents as it deems necessary, or may impose a mortgage or lien on either community or separate property as security. La.R.S. 9:2801(4)(c).
In determining the value of each community asset, including the community interest in the pension right, the court must valuate the asset as of the date of the partition trial on the merits. La.R.S. 9:2801(4)(a); Spaht & Hargrave, supra, at 346. The former spouses continue to be co-owners of the former community property even after the termination of the community and until it has been finally partitioned. See La.Civ.Code arts. 2369, 2369.1; La.Civ.Code art. 2369 comment (c); Spaht & Hargrave, supra, § 7.19. Consequently, when the court partitions a community property interest in a pension right by granting a former spouse cash or other property in lieu of an actual percentage of the pension payments, the court is required to valuate the community's interest in the pension right and the spouse's portion thereof as of the time of the partition trial on the merits.
The general rules for the partition of community property, however, do not address all of the problematic ramifications of classifying, valuating and distributing each spouse's interest in pension benefits which have been earned by one spouse partly during the marriage and partly before or after. In such cases, the pension benefits are composed of the separate property interest of the employee spouse in addition to the community interest. Furthermore, there is no custom from which rules can be derived for each particular situation. Accordingly, in the present case and others a court is bound to proceed and decide equitably to some extent, making resort to justice, reason and prevailing usages. La.Civ.Code art. 4.

*1119 COMPARABLE EQUITABLE PRINCIPLES
In proceeding according to equity, we should be informed by the principles for classifying and dividing pension benefits that have evolved in other jurisdictions which administer systems of community property or equitable distribution of marital property.
Even in the states that do not have the community property system the prevailing trend is to classify property at divorce according to whether it is to be considered in distribution of equal or equitable shares of marital property to each spouse. L. Golden, Equitable Distribution of Property §§ 1.01-02 (1983 & Supp. 1990); I Baxter, Marital Property § 1.2(b) (Supp. 1991). This trend is rooted in recent changes in the status of women and a recognition that a non-employee spouse contributes significantly to the economic well-being of the family. Id. At the same time, recent recognition of the pension right as an item of "property," and a major one for many couples, subject to division or distribution has posed practical problems for courts in every state. Golden, supra at §§ 6.09-6.17. Accordingly, courts and commentators nationwide have had to solve the modern problem of classification, valuation and distribution of a pension right earned by one spouse.
Although there are important differences between the doctrines of community property and equitable distribution, and between the rules of individual jurisdictions, the problems of valuating and dividing community or marital pension rights in other fora are sufficiently analogous to our own to make the reasoning of their courts and commentators considerable and useful. See Niroo v. Niroo, 313 Md. 226, 545 A.2d 35, 40 n. 3 (1988); Rodgers v. Rodgers, 98 A.D.2d 386, 470 N.Y.S.2d 401 (1983); See e.g., Weisfeld v. Weisfeld, 513 So.2d 1278, 1280 n. 1 (Fla. Dist.Ct.App.1987), aff'd, 545 So.2d 1341 (Fla.1989); See also, 3 Family Law and Practice § 38A.08 (A. Rutkin, ed. 1990); Goldberg, Valuation of Divorce Assets § 9.1 (1984 & Supp.1987); L. Golden, Equitable Distribution of Property §§ 1.01-1.12 (1983 & Supp.1990).
The issue of whether a pension was considered in property settlement discussions is a question of fact, with the factfinder afforded much discretion. Hare v. Hodgins, 567 So.2d 670 (La.App. 5 Cir. 1990). There the couple was married in 1951, separated in 1976, partitioned the property in 1977, and divorced in 1978. In 1988, the ex-wife filed a petition for supplemental partition of the retirement benefits. The original community property settlement was silent as to retirement benefits and had no specific waiver of rights language. The contract merely indicated there were no other assets of the community. The court affirmed the trial court's finding the wife was entitled to a supplemental partition of the community asset, namely the retirement benefits. Thus, under Hare, if there is merely standard language liquidating the community, with no mention of the retirement benefits, a spouse may partition for his or her share of the retirement benefits.
In Moreau v. Moreau, 457 So.2d 1285 (La.App. 3 Cir.1984), the ex-wife was allowed to partition the military retirement benefits. The court found that since there was no language transferring the ex-wife's interest in the retirement benefits, she did not waive her rights. The language in the original community property settlement read:
As a result of the transfers and agreements made herein, the parties hereby mutually discharge each other from any further accountings of the community which formerly [97-1369 La.App. 4 Cir. 3] existed between them, the same being fully liquidated as above set forth.
Accordingly, each spouse continued as owner of the retirement benefits and was entitled to a supplemental partition. La. Civ.Code art. 1401; T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La.1975).
*1120 Conversely, in Chrisman v. Chrisman, 487 So.2d 140 (La.App. 4 Cir.1986), another military retirement case, the ex-wife attempted to supplement the original community property settlement based on the retirement benefits. The original community property settlement, with the typographical errors, read:
Alfred B. Chrisman hereby waives any and all other rights that she has or may have against the community existing between Shirley Martin Chrisman and Alfred B. Chrisman.
The contract contained some typographical errors, however, the court found the parties intended the contract to be a final disposition of the property. They were aware of the retirement benefits at the time of the partition, the ex-wife's answer to the petition for divorce referred to the retirement benefits, the ex-wife requested increases in alimony due to the ex-husband's increases in retirement payments, and the ex-wife admitted she knew the retirement benefits were community property. The ex-wife's conduct before and after the partition indicated she waived her right to this property.
The Chrisman decision was followed in Brignac v. Brignac, 96-1702 (La.App. 3 Cir. 6/18/97), 698 So.2d 953. In this case, there was similar language in the original community property settlement as well as a side agreement, which was drafted by the ex-wife's law firm, and read:
It is further agreed and stipulated that by execution of this community property settlement, AUDREY DESORMEAUX will drop all suits before the Courts and will not pursue any further litigation against RAY BRIGNAC resulting from the marriage between them or claim alimony hereafter.
Any ambiguity in the contracts is construed against the party who drafted the document who, in that case, was the ex-wife. The 3rd circuit held, that the side agreement effected a valid compromise and Ms. Brignac waived any right that she may have had to a portion of Mr. Brignac's retirement benefits. Id. at 957.
In the Agreement between Ms. Coleman and Mr. Robinson, the division of the pension plan was not specifically listed. Moreover, both husband and wife testified that the pension plan was not discussed as part of the partition settlement. While Mr. Robinson may have intended to receive his former wife's vested ownership in the pension, he failed to openly discuss such intent with his wife. We are unable to find evidence showing that the pension plan was discussed and the parties intended to include the pension in the partition.[12] Given these facts, Ms. Coleman could not have intended to transfer her right in the pension plan, which was not discussed. Additionally, the failure to include this property as part of the settlement maintained the status of the pension as community property.
Furthermore, her knowledge of such a classification is of no moment. Whether or not she knew that under Louisiana law, the property acquired by either spouse "during the existence of the legal regime through the effort, skill, or industry of either spouse" would be classified as community property, Ms. Coleman undoubtedly expected that she would be entitled to whatever rights were bestowed upon her by Louisiana law. Given the length of their domicile in Louisiana and the fact that the last place of matrimonial domicile was Louisiana, Ms. Coleman was justified in this expectation.
*1121 Accordingly, the general "boilerplate" language used in paragraph 3 did not transfer Ms. Coleman's interests in the pension plan to Mr. Robinson.[13] Louisiana jurisprudence is clear; general divestiture language does not necessarily divest the non-employee spouse of his or her right in the employee spouse's pension. When the agreement does not expressly address the employee spouse's pension, the issue of whether the agreement divests the non-employee spouse of any community property rights in the pension depends upon the intent of the parties. The pension plan was not listed in the parties' Agreement nor was it discussed as part of the settlement. Therefore, the pension was not partitioned. Both Mr. Robinson and Ms. Coleman are co-owners in indivision of the pension benefits, and we must remand this case to the trial court for a precise determination of the ownership rights of each party.

PART II: SURVIVOR'S ANNUITY
Ms. Coleman argues that the court of appeal further erred in affirming the trial court's denial of her right to be designated as the beneficiary of the survivor's annuity. This obligation is contained in the Agreement at paragraph 6. The paragraph is divided into three subparts and concerns Mr. Robinson's obligations of support and maintenance to Ms. Coleman. Paragraph 6, in relevant part, reads:
Wife waives any and all rights to support and maintenance, except as set forth as follows:
(A) Husband has paid to Wife as alimony the sum of Two Thousand and 00/100 Dollars ($2,000) per month, commencing January 1, 1987, and the Husband shall pay to the Wife as alimony the sum of Two Thousand One hundred and 00/100 Dollars ($2,100.00) commencing the first month next subsequent to the execution this Agreement, until the Wife shall die or remarry....
(B) During the period that Husband shall have a duty to make alimony payments to the Wife, he shall keep his life insured in an amount equal to one year's salary earned by Husband, with Wife named as beneficiary....
(C) In the event Husband shall predecease Wife, alimony shall cease; however, Husband agrees to choose Option B of the Government Retirement Plan providing for Wife to receive retirement checks pursuant to government regulations.
Louisiana Civil Code article 2046 sets forth a general rule of construction, providing that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." The underscored word "further" in this article signifies the true nature of contractual interpretation. The determination that the language contained in a contract is clear and explicit, in itself, involves an interpretive process. For that reason, La Civ.Code art.2046 emphasizes that the process involves no further interpretation, as opposed to no interpretation at all. Expose' Des Motifs of the Project of Titles III and IV of Book III of the Civil Code of Louisiana, p. 67 (1984); R. MacLean, Judicial Discretion in the Civil Law, 43 La.L.Rev. 45, 55-56 n. 28 (1982).
La Civ.Code art. 3073 contains a supplementary rule of construction governing the interpretation of the operative language, and the determination of the scope, of a compromise agreement. La Civ.Code art. *1122 3073 provides that a compromise agreement extends only to those matters that the parties expressly intended to settle and that the scope of the transaction cannot be extended by implication. See Comment, Compromise in Louisiana, 14 Tul. L.Rev. 282, 283 (1940).
In applying the rule of construction set forth in La Civ.Code art. 3073, courts are guided by the general principle "that the contract must be construed as a whole and in light of attending events and circumstances." Succession of Teddlie, 385 So.2d 902, 904 (La.App. 2d Cir.), writ refused, 393 So.2d 742 (La. 1980); La Civ.Code art. 2050. Thus, the intent which the words of the compromise instrument express in light of the surrounding circumstances at the time of execution of the agreement is controlling. The meaning and intent of the parties to a written instrument, including a compromise, is ordinarily determined from the four corners of the instrument. Maltby v. Gauthier, 526 So.2d 455, 457 (La.App. 5th Cir.), writ denied, 531 So.2d 474 (La.1988); Smith v. Leger, 439 So.2d 1203 (La.App. 1st Cir.1983).
It is axiomatic that courts construe ambiguities of an agreement against the drafter of an agreement. However, this depends on whether there are any ambiguities present. Reading the "Agreement" as a whole we will find that Mr. Robinson only intended to provide support and maintenance for his former wife on a limited bases. Paragraph 6(A) of the "Agreement" specifically states that alimony would be paid until the wife shall die or remarry. Subsection C would provide support, via the survivor annuity, should he predecease her. The purpose of Mr. Robinson's having to choose Option B was to provide plaintiff with some sort of income to replace the alimony she would lose should he predecease her. However, Mr. Robinson's obligation to pay alimony ceased when Ms. Coleman remarried. Thus, it follows that he was no longer required to choose Option B of the Government retirement plan when she remarried. Such an agreement does not frustrate the public policy of Louisiana. Moreover, under Louisiana the termination upon remarriage is permitted. Brignac v. Brignac, 96-1702 (La.App.3 Cir. 6/18/97); 698 So.2d 953. La.Civ.Code art. 114 provides that an "award of periodic support may be modified if the circumstances of either party change, and shall be terminated if it has become unnecessary." In La.Civ.Code art. 115, the obligation of spousal support is extinguished by, among other things, the remarriage of the obligee or a judicial determination that the obligee has cohabited with another person of either sex in the manner of married persons.
While it is true that Mr. Robinson should have elected Option B during the years between the divorce and Ms. Coleman's second marriage, this obligation extinguished upon Ms. Coleman's remarriage, in October 14, 1988. This now a moot issue. Consistent with the provisions of the pension plan, after her second marriage, Mr. Robinson was free to choose whomever he wanted to receive his portion of the annuity upon his death. As such, it would be beyond this Court's authority to read into the "Agreement" that Mr. Robinson intended to contract away his survivor annuity in favor of his former wife. The courts below did not find this to be the case and we shall follow their wisdom as well.
Alternatively, if we accept that Mr. Robinson intended to designate his former wife as beneficiary, then we must ask whether his designation was proper. After review of the record we find that there is some question whether Mr. Robinson choose his beneficiary according to the government regulation. It appears that Mr. Robinson corresponded with Office of Personnel Management (OPM) regarding the proper way to name a beneficiary for the survivor annuity. OPM related to Mr. Robinson that in order to name his beneficiary it must be done pursuant to a court *1123 order. There nothing in the record that shows Mr. Robinson obtained a court order to choose his beneficiary as per government regulation. As such, its apparent that Mr. Robinson did not possess the legal authority to contract away his survivor annuity benefits without meeting the standards put forth by the federal government. Thus, we find the trial court's ruling and the court of appeal's affirmation without error. This portion of the ruling is affirmed.

CONCLUSION
For the foregoing reasons, we reverse the decision of the court of appeal in part and affirm the decision in part. We remand to the trial court to determine the value of Ms. Coleman's interest in the pension plan. The parties are to bear their own court costs.
KNOLL, J., dissents in part and assigns reasons.
VICTORY, J., dissents and assigns reasons.
TRAYLOR, J., dissents for reasons by VICTORY, J.
KNOLL, Justice, dissenting in part.
For the following reasons, I respectfully dissent from the majority's conclusion that Mr. Robinson's duty to designate Ms. Coleman as the beneficiary of the survivor's annuity ceased upon her remarriage. Before the agreement in question was confected, Mr. Robinson's former New Orleans attorney drafted a property settlement agreement which provided for the designation of Ms. Coleman as the beneficiary of Mr. Robinson's survivor's annuity. This provision stood alone and was in no way tied to Ms. Coleman's right to receive alimony. All correspondence between the parties on the issue, which occurred before either party remarried, indicated that the terms of the agreement would provide this benefit to Ms. Coleman with no conditions attached.[1] The letter accompanying the agreement forwarded to Ms. Coleman confirmed that the agreement "sets forth everything we have agreed on concerning alimony, survivor's annuity, etc." Further, in the final agreement, although the paragraph providing for a survivor's annuity comes under the heading, "[w]ife waives any and all rights to support and maintenance, except as set forth as follows," the agreement does not specifically provide that this duty ceases upon remarriage. As ambiguities are construed against the drafter of the agreement, any ambiguity found in this provision is construed against Mr. Robinson. Thus, because the agreement did not specify that Mr. Robinson's duty to designate Ms. Coleman as the beneficiary ceased upon her remarriage, in my view the trial court erred in denying Ms. Coleman's supplemental petition seeking enforcement of this provision which obligated Mr. Robinson to designate her as the recipient of the survivor's annuity.
VICTORY, J., dissenting.
I dissent from the majority's holding that the general divestiture language in the partition settlement agreement (the "Agreement") did not transfer Ms. Coleman's interest in her husband's pension plan.
The majority opinion omits several salient details in finding that Ms. Coleman did not intend to waive her rights to the pension. The first is that Ms. Coleman *1124 was represented by a very competent divorce attorney throughout the settlement negotiations. Ms. Coleman testified that she knew about the pension at the time she entered into the Agreement and that she told her attorney about the pension; however, she claims that her attorney never told her that the pension was partially community property. Her attorney testified that he could not recall his conversations with her, but that it was his practice to find out about any pensions that may be community property and to advise his client as such. He also testified that it was his practice to go over any property settlement with his client line by line and Ms. Coleman testified that he did so, although she testified that the pension was never discussed, outside the provision relating to the survivor's annuity.
The trial court made a finding that "Ms. Coleman, having been represented by counsel, knew that the Agreement served to transfer and release all her marital rights." The court of appeal found that "Ms. Coleman's contention that her former husband's retirement benefits were not partitioned because she was unaware that they may have been community property seems incredulous." The majority does not address these factual findings, which cannot be overturned unless they are found to be manifestly erroneous.
Second, the majority opinion fails to point out that, instead of the other community assets being divided equally, Ms. Coleman received the following: (1) onehalf of the proceeds from the sale of the couple's house, with no obligation to repay Mr. Robinson any portion of the $64,000 in separate property that he put into the house; (2) a two-year old Lincoln Town Car; and (3) approximately $100,000 worth of community antiques. Given that the pension benefits were not to be received until five years later and that Ms. Coleman was to be designated as the beneficiary of the survivor's annuity of the pension, it certainly appears, and the lower courts found, that Ms. Coleman intended to waive her rights to the pension in exchange for other property. Thus, contrary to the majority's holding, the agreement between Ms. Coleman and Mr. Robinson did not unfairly benefit Mr. Robinson to the detriment of Ms. Coleman.
In light of these factors, the majority's holding is clearly wrong. The parties chose North Carolina law to apply to the Agreement. La.Civ.Code art. 3540 allows this unless North Carolina law contravenes Louisiana's public policy. The majority's application of Civil Code articles 3515 and 3527 and its subsequent conclusion that under those two articles, Louisiana law applies, is misplaced. Those articles govern choice of law issues only when the parties do not stipulate what law will apply to their contract and only then are contacts with the applicable states relevant. There is no question that had the parties not chosen North Carolina law to apply, that Louisiana law would apply under La. Civ.Code art. 3515 or 3527. However, parties in Louisiana are free to chose which state's law will govern their obligations without regard to either party's contacts with that state. It is only when application of the chosen law "contravenes the public policy of the state whose law would otherwise be applicable under Article 3527" that the courts will not give effect to the chosen law. Thus, the majority's conclusion that "[a]s a result of Louisiana's significant connection to the parties and their Agreement, Louisiana law must be applied to construe this Agreement ..." is erroneous. Op. at 1116.
While I recognize that Louisiana certainly does have a strong public policy supporting community property, Louisiana law does not prohibit a wife from relinquishing her community property rights to a pension in exchange for other property rights, which is what occurred in this case. Nothing in this Agreement contravenes any public policy of Louisiana. The majority attempts to justify the disregard of the parties' choice of North Carolina law by stating that "[t]o chose a state's law that *1125 would unfairly benefit one spouse over another, absent some significant connection to that state is not just, and more importantly, against the public policy of our state." Op. at p. 1117. However, as I have pointed out, this agreement did not unfairly benefit Mr. Robinson over Ms. Coleman, as she received substantial consideration for her waiver of rights to the pension.
Under North Carolina law, if one party signs a property settlement containing a blanket waiver, there is a waiver to equitable distribution, even though the property is not specifically listed. Blount v. Blount, 72 N.C.App. 193, 195, 323 S.E.2d 738 (N.C.App.1984); Small v. Small, 93 N.C.App. 614, 379 S.E.2d 273 (1989). Thus, under North Carolina law, Ms. Coleman transferred her rights to the pension to Mr. Robinson by virtue of the broad waiver language contained in the Agreement.
Furthermore, even if La.Civ.Code art. 3540 required the application of Louisiana law, Ms. Coleman still transferred her rights to the pension. The jurisprudence in Louisiana indicates that whether a wife will be found to have waived her rights to a supplemental partition of her husband's pension by entering into a property settlement agreement containing broad waiver language largely depends on the wife's intent at the time. In the cases relied upon by the majority, the wife was found not to have waived her rights to the pension because there was no evidence that was her intent. Hare v. Hodgins, 567 So.2d 670 (La.App. 5 Cir.1990), aff'd in part, rev'd in part, 586 So.2d 118 (La. 1991); Faucheux v. Faucheux, 97-1369 (La.App. 4 Cir. 1/28/98), 706 So.2d 654, writ denied, 98-0482 (La.4/9/98), 717 So.2d 1146. In fact, in Hare v. Hodgins, the wife testified that she did not even know of the existence of the pension. To the contrary, in cases where the wife knows of the pension and knows the pension is community property when she enters into a settlement agreement, particularly where she is represented by counsel, a blanket waiver will operate to divest the wife of her right to a partition of her husband's pension. Chrisman v. Chrisman, 487 So.2d 140 (La. App. 4 Cir.1986); Brignac v. Brignac, 96-1702 (La.App.3 Cir. 6/18/97), 698 So.2d 953, writ denied, 97-2584 (La.1/16/98), 706 So.2d 976.
As stated above, the trial court found that "Ms. Coleman, having been represented by counsel, knew the Agreement served to transfer and release all her marital rights." Because this was her intent, under this state's jurisprudence, the blanket waiver in the Agreement did operate to divest her of her right to a supplemental partition of Mr. Robinson's pension. Chrisman, supra; Brignac, supra.
Finally, to entitle Ms. Coleman to a supplemental partition of the pension in light of the clear language of the Agreement and the trial court's finding that she intended to waive her right to the pension is completely unjust considering the substantial benefits she obtained at the time of the divorce. If this aspect of the Agreement is thrown out, then the remainder of the Agreement should also be thrown out and Mr. Robinson should be allowed to assert a claim for (1) the $64,000 of his separate property that he put into the community house, (2) his share of the Lincoln Town Car, and (3) his share of $100,000 worth of community antiques.
I also dissent from the majority's holding that Mr. Robinson's obligation to designate Ms. Coleman as beneficiary of the survivor's annuity terminated once his obligation to pay alimony terminated and disagree with their reasoning that "the purpose of Mr. Robinson's having to choose Option B was to provide plaintiff with some sort of income to replace the alimony she would lose should he predecease her" and that consequently, when his alimony obligation ceased upon her remarriage in 1988, so did his obligation to designate her as beneficiary of the survivor's annuity. Op. at 1121.
*1126 In the first draft of the agreement, this obligation was certainly not tied to alimony. All the correspondence between the parties on this issue, which occurred before either party remarried, indicated that the terms of the Agreement would provide that Mr. Robinson would designate Ms. Coleman as the beneficiary of the survivor's annuity, with no conditions attached. When Mr. Robinson forwarded the Agreement to Ms. Coleman, in the accompanying letter he confirmed that the Agreement "sets forth everything we have agreed on concerning alimony, survivor's annuity, etc." Further, at the time the Agreement was executed, Ms. Coleman was not remarried and thus Mr. Robinson was clearly obligated to designate her as the beneficiary at that time.
In the final Agreement, although the paragraph providing for a survivor's annuity comes under the heading "Wife waives any and all rights to support and maintenance, except as set forth as follows:," the Agreement does not specifically say that this duty ceases upon remarriage. This is in contrast to the duty to provide alimony, which specifically ceases when Ms. Coleman remarries, and the duty to provide life insurance, which specifically ceases when alimony ceases. Mr. Robinson's duty to designate Ms. Coleman as beneficiary of the survivor's annuity, unconditionally, was specifically negotiated by the parties and was one of the valuable benefits Ms. Coleman received in return for waiving her future rights to the pension. Further, if the clause is ambiguous, it must be construed against the drafter, Mr. Robinson. Thus, I respectfully dissent.

ON APPLICATION FOR REHEARING
PER CURIAM.
In her application for rehearing, plaintiff Coleman takes issue with the language in the majority opinion which states that "we must classify the pension benefits attributable to the community from the time the parties were domiciled in Louisiana until the Judgment of Separation as community property." That language was not intended to dispose of either the classification or distribution issue regarding the pension benefits, and those issues were not before this court. The parties can litigate those legal issues on remand in the district court as part of the proceeding to determine the value of Coleman's interest in the pension plan.
With that clarification, the application is otherwise denied.
NOTES
[*] Marcus, J. (now retired), not on panel. See Rule IV, Part 2, Sec. 3.
[1] By letter, the defendant urged his former wife to sign the Agreement as soon as possible, pointing out that the parties had nothing binding regarding his agreement to pay alimony and to designate her as recipient of the survivor benefits. Ms. Coleman asserts that she felt considerable pressure to finalize the proposed settlement hastily because she was unemployed and solely dependent upon income from the proposed alimony agreement.
[2] The New Orleans draft contained several paragraphs that differed from the North Carolina Agreement. Those, of relevance, are:

1. Husband and Wife sold the former matrimonial domicile belonging to the community of acquets and gains formerly existing between the parties and proceeds were divided equally.
* * *
4. Each of the parties is to keep what is presently in their possession. The parties also acknowledge that Leslie L. Robinson, Jr. has separate property which property is to remain in his possession and that all household goods which were located in the former community existing between the parties are the property of June Coleman Robinson.
* * *
7. Husband and Wife further agree that they have hereby accomplished a complete liquidation of the community of acquets and gains formerly existing between them, and they do accordingly hereby mutually release and forever discharge each other from any and all further claims and demands and any and all further accounting between them. It is the intention of the parties that henceforth there shall be, as between them, only such right and obligations as are specifically provided for in this Agreement, and the parties acknowledge that the allocation made to them has resulted in each party's receiving an equal share of the community property.
* * *
9. This Agreement shall be construed in accordance with the laws of the State of Louisiana, entirely independent of the law as of any forum where it may subsequently be the subject of judicial construction or enforcement....
[3] Defendant also sought and obtained a judgment to recover $25,000 he had loaned Ms. Coleman at the time of the Agreement, but that had not been timely repaid. The court denied legal interest on this debt.
[4] Matrimonial agreement is a contract establishing a regime of separation of property or modifying or terminating the legal regime. LA.CIV.CODE ART. 2328.
[5] LA.CIV.CODE ART. 461: "... Incorporeals are things that have no body, but are comprehended by the understanding, such as the rights of inheritance, servitudes, obligations, and rights of intellectual property." LA.CIV. CODE ART. 473: "Rights, obligations, and actions that apply to a movable thing are incorporeal movables. Movables of this kind are such as bonds, annuities, and interests or shares in entities possessing juridical personality...."
[6] All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537. LA. CIV. CODE ART. 3540.
[7] Sally Burnett Sharp, Fairness Standards and Separation Agreements: A Word of Caution on Contractual Freedom, 132 U.PA.L.REV. 1399, 1405-06 (1984).
[8] Id. at 1406; Pitre v. Pitre, 247 La. 594, 172 So.2d 693, 694 (1965).
[9] Id.
[10] North Carolina recognizes the concept of "marital property" and defines it as real and personal property acquired by either spouse during the course of the marriage and before the date of separation, including vested pension, retirement, and other deferred compensation rights. N.C.G.S. § 50-20(b)(1). Prior to the enactment of the Equitable Distribution Act, the property accumulated by parties during the marriage went, upon divorce, to the person in whose name the property was titled. While a wife may have made substantial contributions to the financial well-being of the family during the course of the marriage, she had no legal claim to property except that to which she was record owner. Hagler v. Hagler, 319 N.C. 287, 354 S.E.2d 228 (1987).
[11] Mr. Robinson filed a complaint in the district court of North Carolina seeking a declaratory judgment that his former spouse, Ms. Coleman had no rights in his pension benefits. The court of appeals would not exercise jurisdiction over Ms. Coleman, recognizing that "defendant did not have sufficient minimum contacts with North Carolina to give the trial court jurisdiction over her in this declaratory judgment action relating to a separation and property settlement agreement where defendant never came to this state for any legal actions or negotiations arising out of her marriage to plaintiff; at no time did she seek to invoke the protection of North Carolina law; she never resided, owned property, or even visited the state; and the agreement giving rise to this action did not become binding until defendant signed it in Louisiana."
[12] In a similar case decided by the Fourth Circuit Court of Appeal, the court relied on the testimony of the parties to determine whether the parties intended to partition the pension plan with general divesture language. Faucheux v. Faucheux, 97-1369 (La.App. 4 Cir. 1/28/98), 706 So.2d 654. Finding nothing in the record that indicated the wife was aware of her right in the pension plan or that the parties openly discussed the pensions as part of the settlement, the wife was entitled to a partitioning of the benefits. Id. at 657.
[13] Mr. Robinson argues that Ms. Coleman was aware of his pension plan as it was specifically referenced in the contract. Moreover, Ms. Coleman admits to knowing of the pension plan, but states she was unaware of any interest she may have had in the pension plan because it was community property. In this instance, Ms. Coleman could not have transferred her right in the pension plan to Mr. Robinson because she did not intend to do so. See Faucheux v. Faucheux, 97-1369 (La.App. 4 Cir.1/28/98), 706 So.2d 654 (Wife is eligible for supplemental partition even though she knew of the pension plan. She was not aware she had a vested right in the pension.)
[1] One other indication that the survivor's annuity was not tied to the conditions of alimony can be found in a letter sent by Mr. Robinson encouraging Ms. Coleman to sign the agreement as quickly as possible. In the letter, Mr. Robinson informed her that if she was not designated as the beneficiary of the survivor annuity, then she would lose her medical coverage. However, it later became apparent to Ms. Coleman through a pre-trial deposition that this was untrue because she continued to receive coverage even after Mr. Robinson failed to designate her as the beneficiary. Mr. Robinson's desire to have the agreement signed and to provide medical coverage through the annuity shows his intent to list her on the annuity regardless of the alimony agreement.